EXHIBIT 2

E-FILED
Thursday, 10 June, 2021  02:16:59 PM
Clerk, U.S. District Court, ILCD

| | | |
|---|---|---|
| UNITED STATES DISTRICT COURT | ) | Kupferschmidt v. Wexford, et al. |
| | ) | |
| CENTRAL DISTRICT OF ILLINOIS | ) | Case No. 20-1071 |

## DECLARATION OF MEAGHAN WILKEY LEIPOLD

I, MEAGHAN WILKEY LEIPOLD, do hereby declare, that I have personal knowledge of the facts set forth herein, that I am competent to testify and if called to testify would state as follows:

1. I am a registered nurse. I was employed with the State of Illinois as a corrections nurse 1 at Pontiac Correctional Center from August 2018 to April 2019.

2. As a corrections nurse at Pontiac Correctional Center, I provided medications to inmates, assessed inmates at sick call, responded to medical emergencies, and performed other duties as assigned. I regularly completed offender injury reports and progress notes in the course of my duties as a corrections nurse 1.

3. As a registered nurse, I cannot order diagnostic testing and imaging; do not perform diagnostic testing and imaging; and I do not have any involvement in the approval, denial, or scheduling of inmates to receive these tests. A medical doctor must order these tests. I also cannot order or prescribe medications other than what is approved per the treatment protocols. Only a nurse practitioner, physician assistant, or doctor can.

4. On November 25, 2018, inmate Richard Kupferschmidt arrived at the healthcare unit and he was seen by me. At the request of the office of the Illinois Attorney General, I reviewed an offender injury report and progress note that I wrote during Mr. Kupferschmidt's visit on this date. These notes are written by the medical professionals who saw the inmate during or soon after the inmate's visit in the healthcare unit. I recognize the signature on both pages of the report as my own.

5. According to offender injury report, Mr. Kupferschmidt's injury occurred at approximately 11 a.m. on the Medium Security Unit yard. He complained of an injury to his left calf sustained on the yard while he was playing football.

6. As part of the completion of an offender injury report, nurses note objective and subjective findings, such as the inmate's demeanor, observations made by the nurse, the inmate's description of the injury, pain level, and vital signs.

7. Based on my notes in the offender injury report, Mr. Kupferschmidt reported that it felt like something in the back of his calf popped, like a GSW (gunshot wound), to the back of his left calf. He reported that his pain was an eight out of ten and he was observed to be joking with c/o (correctional officers) while in the holding tank. In the injury report, R stands for respiration or breaths per minute, P stands for pulse, T stands for temperature, and BP stands for blood pressure. Mr. Kupferschmidt's temperature was documented 97.6, his pulse was 76, his respiration was 16 breaths per minute, and his blood pressure was 122/84. He stated that he could not stand then was observed standing up and walking from a chair to the gurney in the healthcare unit. Mr. Kupferschmidt was also noted to have FROM (full range of motion) and no deformity to the knee or calf upon assessment. He was alert and oriented to person, place, and time, as reflected in my note: A&Ox3. No acute distress was noted.

8. I also note the follow-up treatment plan on the offender injury report. Based on my notes, a TORB—or telephone order read back from Dr. Tilden was given. Whenever a nurse calls a doctor for further direction or instructions, we give a report on a patient based on our notes and observations. If the doctor gives a nurse orders regarding patient care, the order is read back to the doctor for confirmation that it is accurate. The doctor's orders to me are recorded on the injury report and the progress note. Based on these notes, I called Dr. Tilden and gave a

report on Mr. Kupferschmidt. The orders given to me were to have Mr. Kupferschmidt to continue medications as prescribed, refer him to nurse practitioner sick call on November 27, 2018 for follow-up and evaluation, provide a lay-in permit with meals for five days, and have Mr. Kupferschmidt follow up PRN—which means as needed. I received no instructions that Mr. Kupferschmidt was to be transported to the hospital.

9. I gave Mr. Kupferschmidt a lay-in permit as ordered, and my signature appears on the bottom of the permit.

10. Nurses assessing inmates in the healthcare unit also complete progress notes. I completed a progress note for Mr. Kupfersschmidt's visit on November 25, 2018. The notes include information on whether the inmate was referred to the doctor, a description of the pain the inmate is experiencing, and the pain level, among other things. These progress notes are based on protocols that we follow. I noted Mr. Kupfeschmidt's pain level as an eight out of ten. I also noted that he was currently prescribed Ultram and Voltaren. Ultram is a pain medication that was received by the inmate at the medication line. Voltaren is a pain medication that the inmate would have received on a blister pack to take on his own accord as prescribed. The orders per Dr. Tilden at this time were to continue the current pain medications without further orders.

11. Mr. Kupferschmidt alleges that he saw me in the med line on December 4, 2018, and that I told him that I would not see him and to put in for sick call. I do not recall this incident. Per my timekeeping records I was not at the facility on the date of December 4, 2018.

12. In med line, between 150 to 250 inmates line up in a housing unit to receive their prescribed medications either through DOT (direct observation therapy) or to pick up cards of medications/blister packs, also referred to as "maintenance medication." Patient assessments and

treatment is not given during the time medications are administered in med line, for patient safety, unless deemed an emergency needing immediate attention.

13. Nurse Sick Call lines are completed after med line. During this time, inmates who have previously submitted sick call slips are seen. A nurse would have access to these inmates' medical charts. Inmates who have not submitted sick call slips and who have medical complaints can also been seen during this time. Depending on the medical situation, the inmate may be referred to a doctor or referred to urgent care for further evaluation and treatment if necessary.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: May 25 , 2021          Signed: _____

                                              MEAGHAN LEIPOLD