E-FILED
Friday, 25 June, 2021  04:39:44 PM
Clerk, U.S. District Court, ILCD

046772/21061/JNR/JCS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

RICHARD KUPFERSCHMIDT,

      Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC.,
ANDREW TILDEN, SHEILA MARA, and
ANNA MEGAN,

      Defendants.

Case Number  20 cv 1071

Hon. Sara Darrow

## MOTION FOR SUMMARY JUDGMENT

NOW COMES Defendants, WEXFORD HEALTH SOURCES, INC, ANDREW TILDEN, MD and SHEILA MARA, NP, by and through their attorney, Joy C. Syrcle of CASSIDAY SCHADE LLP, and, pursuant to Federal Rule of Civil Procedure 56 and CDIL-LR 7.1(D), hereby submit their Motion for Summary Judgment, stating as follows:

## INTRODUCTION

Despite extensive treatment, testing, pain medication and referrals to outside specialists, Plaintiff alleges Dr. Tilden and Nurse Practitioner Mara violated his Eighth Amendment rights in relation to treatment of an injury to his left calf he alleges was sustained while playing football on the yard at Pontiac Correctional Center ("Pontiac"), where he is incarcerated.   Specifically, Plaintiff was given X-rays, an ultrasound, pain medication, anti-inflammatory medication, crutches, a boot to immobilize his ankle and calf, accommodations to allow for recovery, referral to three visits with two separate outside orthopedic specialists and physical therapy.   Plaintiff further alleges Wexford violated his constitutional rights through a policy of denying referrals to outside specialists, yet every referral for Plaintiff was approved and Plaintiff was seen multiple

times by outside specialists.  As discussed in detail below, Plaintiff's claims fail as a matter of law and Defendants are entitled to summary judgment.

## UNDISPUTED MATERIAL FACTS

1.      Plaintiff is an inmate incarcerated in Pontiac.   (Deposition of Plaintiff, attached hereto as Exhibit A, 5:13-22).

2.      Plaintiff's claims arise from treatment of a calf injury that occurred at Pontiac. (Ex. A, 5:13-22).

3.      Sheila Mara ("Mara") is a nurse practitioner licensed to practice in the State of Illinois.  (Mara Declaration, attached hereto as Exhibit B, ¶1).

4.      Mara has been employed by Wexford Health Sources, Inc. ("Wexford") as a nurse practitioner at Pontiac since July 17, 2018.  (Ex. B, ¶2).

5.      Dr. Tilden is a physician licensed to practice in the State of Illinois. (Declaration of Dr. Tilden, Attached hereto as Exhibit C, ¶1).

6.      Dr. Tilden has been the medical director at Pontiac from November 2010 to March 2018, and from October 31, 2018 to present.  (Ex. C, ¶2).

7.      Prior to Mara's first encounter with Plaintiff, Plaintiff was being treated for complaints of hip pain.   (Ex. B, ¶4; See also Plaintiff's medical records, attached hereto as Exhibit D).

8.      Plaintiff had previously undergone a hip X-ray which revealed minor, early osteoarthritis. (Ex. B, ¶4).

9.      Prior to Mara's first encounter with Plaintiff, Plaintiff had been prescribed Ultram (also referred to as Tramadol) and naproxen for pain.   (Ex. B, ¶4).

10.      The typical dose for Ultram ranges from 25 mg to 100 mg, two to four times per day, not to exceed a maximum of 400 mg per day.  (Ex. B, ¶5).

11.     Ultram is an opioid which has the potential of addiction and side effects from long-term use.  (Ex. B, ¶6).

12.     Where possible, it is preferable to look for alternatives to opioid pain medications for chronic conditions that would require long-term treatment. (Ex. B, ¶6).

13.     On August 6, 2018, another provider renewed Plaintiff's pain medication for his arthritis, prescribing Ultram 50 mg. twice a day and naproxen 500 mg twice a day, each for three months. (Ex. B, ¶7).

14.     Mara first examined Plaintiff on August 30, 2018, in urgent care for complaints of left hip pain.  (Ex. B, ¶8).

15.     On August 30, 2018, Plaintiff questioned why his Ultram dose had been lowered from the prior 100 mg. twice per day.  (Ex. B, ¶8).

16.     Mara noted Plaintiff's hip X-ray showed only minimal early osteoarthritis. (Ex. B, ¶8).

17.     On August 30, 2018, Plaintiff did not report any recent injury.   (Ex. B, ¶8).

18.     On August 30, 2018, Mara ordered that Plaintiff's Ultram be continued at the same dose of 50 mg twice per day and discussed use of muscle rub and other non-medication means of chronic pain management.  (Ex. B, ¶8).

19.     Dr. Tilden examined Plaintiff on November 6, 2018 for complaints of left pain in his left hip (sacroiliac ("SI") joint pain).  (Ex. C, ¶5).

20.     At the November 6, 2018 visit, Plaintiff reported a contusion 14 months prior and complained of chronic pain.  (Ex. C, ¶5).

21.     In the musculo-skeletal exam, the left SI join was tender to deep palpitation with full range of motion.  (Ex. C, ¶5).

22.     Plaintiff's left hip had full range of motion without neuromuscular defects.  (Ex. C, ¶5).

23.     Dr. Tilden ordered an X-ray of Plaintiff's left hip and left SI joint to rule out degenerative joint disease of the SI joint. (Ex. C, ¶5).

24.     Dr. Tilden advised Plaintiff on use of a topical rub for pain twice a day for six months. (Ex. C, ¶5).

25.     Plaintiff next saw Mara on November 20, 2018 at sick call for renewal of his pain medication.  (Ex. B, ¶9).

26.     On November 20, 2018, Plaintiff complained of pain in his left lower extremity and left hip.

27.     Mara noted Plaintiff previously had an MRI of his foot that was essentially normal, with minor, non-fracture, stress injury.  (Ex. B, ¶9).

28.     Mara also again noted the X-ray of Plaintiff's left hip from early 2018 that showed minimal osteoarthritis only. (Ex. B, ¶9).

29.     Upon observation on November 20, 2018, Plaintiff had a steady gait and stood upright and full range of motion of all extremities.  (Ex. B, ¶9).

30.     Mara's physical examination of Plaintiff on November 20, 2018 revealed no significant findings. (Ex. B, ¶9).

31.     Mara renewed his prescription for Ultram 50 mg twice per day for 3 months but discussed tapering the dosage at the next visit once the colder months passed as cold can exacerbate arthritis.  (Ex. B, ¶9).

32.     At Plaintiff's request, Mara discontinued naproxen and ordered Votaren 75 mg twice a day for three months. (Ex. B, ¶9).

33.    Voltaren is a topical anti-inflammatory medication used to treat arthritis pain. (Ex. B, ¶9).

34.    On November 25, 2018, Plaintiff saw a nurse in urgent care, complaining of injury to his calf that he reported occurred while playing football on the yard. (Ex. B, ¶10).

35.    The nurse contacted the Medical Director who ordered a lay-in, meaning Plaintiff was essentially on bed rest, with meals provided to him, for five days. (Ex. B, ¶10; Ex. C, ¶6).

36.    The nurse also scheduled Plaintiff to see Mara on November 27, 2018.  (Ex. B, ¶10).

37.    Mara examined Plaintiff on November 27, 2018, following the referral in relation to the calf injury.  (Ex. B, ¶11).

38.    Plaintiff reported his calf was injured two days prior.  (Ex. B, ¶11).

39.    Mara conducted the Homans sign test, in which she checked the calf for signs of deep vein thrombosis.  (Ex. B, ¶11).

40.    There was no redness, warmth or edema to the left calf on November 27, 2018. (Ex. B, ¶11).

41.    Mara continued Ultram and Voltaren as previously ordered.  (Ex. B, ¶11).

42.    In addition, Mara ordered the muscle relaxer Flexeril 10 mg. at night for three nights and a muscle rub twice a day.  (Ex. B, ¶11).

43.    Mara also ordered that the previously ordered lay-in continue to November 30, 2018 and a follow-up in 2 weeks.  (Ex. B, ¶11).

44.    Mara would have no way of knowing when a medication was out of stock at the facility unless someone in the healthcare unit brought it to her attention to provide an alternative, available treatment. (Ex. B, ¶12).

45.     At the time Mara prescribed the Flexeril, she was not aware if it was out of stock. (Ex. B, ¶12).

46.     Plaintiff reported to nurse sick call on December 4, 2018, complaining that his calf pain was worse.  (Ex. C, ¶8).

47.     The nurse referred Plaintiff to see Dr. Tilden on December 5, 2018, for compliant of 10-day old trauma to left calf.   (Ex. C, ¶8).

48.     Dr. Tilden examined Plaintiff on December 5, 2018, and observed tenderness, swelling, and bruising of the left calf. (Ex. C, ¶8).

49.     Dr. Tilden assessed possible contusion and partial rupture of calf muscle.  (Ex. C, ¶8).

50.     On December 5, 2018, Dr. Tilden ordered an X-ray of Plaintiff's calf, Robaxin 75 mg. twice a day for ten days, Motrin 600 mg. twice a day, hot packs twice a day for 10 days and return for follow-up in 10 days.  (Ex. C, ¶8).

51.     Dr. Tilden next saw Plaintiff on December 14, 2018, for the follow-up appointment in relation to the calf injury.  (Ex. C, ¶9).

52.     On December 14, 2018, Plaintiff continued to complain of pain and swelling in his left leg.  (Ex. C, ¶9).

53.     Dr. Tilden observed fluid collection in Plaintiff's left calf, but no discoloration and the calf was neurovascularly intact.   (Ex. C, ¶9).

54.     Dr. Tilden prescribed an increase of Ultram to 100 mg twice per day and ordered an ultrasound of Plaintiff's left calf to rule out deep vein thrombosis ("DVT").   (Ex. C, ¶9).

55.     DVT is a condition that occurs when blood clots in veins.  (Ex. C, ¶9).

56.     DVT can present with symptoms similar to those observed in Plaintiff.  (Ex. C, ¶9).

57.     It was important to rule out DVT as it would have required significantly different treatment and is potentially dangerous.  (Ex. C, ¶9).

58.     In addition, Dr. Tilden ordered Plaintiff to use crutches to walk, ordered blood tests and a 24-hour infirmary hold for observation.  (Ex. C, ¶9).

59.     Plaintiff had the ultrasound on December 14, 2018 at St. James Hospital, which ruled out deep vein thrombosis.  (Ex. C, ¶10).

60.     The ultrasound showed intramuscular fluid collection that may be secondary to hemorrhage associated with partial plantaris tendon rupture.  (Ex. C, ¶10).

61.     The plantaris tendon is the tendon that extends from the back of the knee down through the calf muscle and attaches to the achilles tendon near the ankle.  (Ex. C, ¶11).

62.     The typical treatment for a partial plantaris tendon rupture is to rest it, avoiding weight bearing, and allow it to heal naturally. (Ex. C, ¶12).

63.     Most plantaris ruptures heal within two to eight weeks if allowed to properly rest. (Ex. C, ¶12).

64.     Use of pain medication for the plantaris rupture is typically limited to non-steroid anti-inflammatories.   (Ex. C, ¶12).

65.     Plaintiff was monitored by the nursing staff in the infirmary on December 14 and 15, 2018.  (Ex. C, ¶13).

66.     According to the records, on December 15, 2018, Plaintiff was stable and reported feeling better and indicated the pain meds were effective.  (Ex. C, ¶13).

67. Dr. Tilden discharged Plaintiff from the infirmary on December 15, 2018, with instruction to continue current medications and avoid weight bearing on his left leg. (Ex. C, ¶14).

68. Dr. Tilden scheduled Plaintiff for follow-up in urgent care on December 20, 2018. (Ex. C, ¶14).

69. Dr. Tilden saw Plaintiff for follow-up on December 20, 2018. (Ex. C, ¶15).

70. Dr. Tilden explained that they had ruled out deep vein thrombosis and the ultrasound revealed a possible partial rupture of the plantaris tendon. (Ex. C, ¶15).

71. Dr. Tilden conducted a neuromuscular exam that showed the left leg had good range of motion with pain in the left calf. (Ex. C, ¶15).

72. Dr. Tilden ordered prednisone 20 mg every morning for 10 days then 10 mg every morning for a month to decrease inflammation. (Ex. C, ¶15).

73. Dr. Tilden revised the Ultram prescription back to the 50 mg twice a day for ten days and advised Plaintiff to continue to use crutches to avoid weight bearing on his left leg. (Ex. C, ¶15).

74. Dr. Tilden ordered a follow-up appointment for Plaintiff in two weeks in urgent care. (Ex. C, ¶15).

75. A nurse practitioner ordered that the Plaintiff's Ultram be crushed. (Ex. C, ¶16).

76. Crushing of medications is a common practice in prison settings to avoid the possibility that the medication can be held in the mouth to be traded or sold to other inmates. (Ex. C, ¶17).

77. Crushing of medication does not alter its effectiveness. (Ex. C, ¶17).

78.     Plaintiff complained to a nurse about the crush order on December 25, 2018 and the nurse advised him of his right to refuse medication.  (Ex. C, ¶18).

79.     On December 25, 2018, the nurse reported Plaintiff had only one of his crutches with him and was not using it.  (Ex. C, ¶18).

80.     The nurse observed Plaintiff in no acute distress, his gait was steady with no limp and he was able to stand upright with no favoring of any extremity. (Ex. C, ¶18).

81.     Dr. Tilden saw Plaintiff for follow-up on January 2, 2019, at which time Plaintiff continued to complain of pain in his left calf.   (Ex. C, ¶19).

82.     Upon Dr. Tilden's observation, the calf appeared tender on the medial aspect, or inner portion, of his left ankle.  (Ex. C, ¶19).

83.     Based on the location of the tenderness, Dr. Tilden ordered an X-ray of the left ankle.  (Ex. C, ¶19).

84.     As of January 2, 2019, Plaintiff's Ultram prescription had expired.  (Ex. C, ¶19).

85.     On January 2, 2019, Dr. Tilden prescribed Motrin 600 mg twice a day for 2 months and ordered Plaintiff continue to use crutches to walk and apply hot packs. (Ex. C, ¶19).

86.     Also on January 2, 2019, Dr. Tilden also submitted a request to collegial review for a referral for Plaintiff to see an orthopedic specialist at University of Illinois – Chicago (UIC). (Ex. C, ¶20).

87.     Following discussion in collegial review, the request for the orthopedic specialist referral was approved and the referral was made on or about January 3, 2019.   (Ex. C, ¶21).

88.     Appointments for outside referrals are scheduled based on the outside physician's availability. (Ex. C, ¶24).

89.     Plaintiff complained to a nurse on January 24, 2019, that the Motrin was not working.  (Ex. C, ¶25).

90.     The nurse consulted the nurse practitioner, who ordered the Motrin be substituted with Tylenol.  (Ex. C, ¶25).

91.     Plaintiff complained on February 9, 2019, that Tylenol was not working and requested to see the nurse practitioner.   (Ex. C, ¶26).

92.     Mara saw Plaintiff in the cellhouse on February 14, 2019, at which time she noted he had already been approved for an outside referral and was scheduled to see an orthopedic specialist.  (Ex. B, ¶14; Ex. C, ¶27).

93.     Based on Plaintiff complaints of that the Tylenol was not working, Mara discontinued Tylenol and re-started Plaintiff's prescription for Ultram 50 mg. twice a day for 3 months, with an order that it be crushed, and ordered Tums.   (Ex. B, ¶14; Ex. C, ¶27).

94.     Mara did not examine Plaintiff again in relation to his calf pain after February 14, 2019. (Ex. B, ¶15).

95.     Another nurse practitioner saw Plaintiff on March 7, 2019, in relation to complaints of leg pain.  (Ex. C, ¶28).

96.     On March 7, 2019, the nurse practitioner noted Plaintiff walked with a mild limp and the left calf was slightly smaller in size compared to the right calf but observed no streaking or warmth in the calf.  (Ex. C, ¶28).

97.     The nurse practitioner reduced Plaintiff's Ultram prescription to be given at bedtime only and be crushed and added Cymbalta once a day, starting with 30 mg per day for one week then increasing to 60 mg per day for two months.  (Ex. C, ¶28).

98.     Plaintiff saw the orthopedic specialist at UIC on March 22, 2019.  (Ex. C, ¶29).

99.     The specialist assessed Plaintiff as having a partial to complete rupture of the plantaris tendon in the lower left extremity.  (Ex. C, ¶29).

100.    The orthopedic specialist recommended a CAM boot immobilizer and follow-up in one month. (Ex. C, ¶29).

101.    The orthopedic specialist did not recommend any additional diagnostic testing. (Ex. C, ¶29).

102.    Dr. Tilden next saw Plaintiff on March 26, 2019, for follow-up from this visit with the orthopedic specialist.  (Ex. C, ¶30).

103.    Based on recommendations of the specialist, Dr. Tilden ordered a CAM boot for two months to immobilize Plaintiff's ankle and calf.  (Ex. C, ¶30).

104.    Dr. Tilden increased the Ultram prescription to twice per day for two months, removed the crush order and continued the other medications.   (Ex. C, ¶30).

105.    Dr. Tilden next saw Plaintiff on April 11, 2019, when Plaintiff continued to complain of pain in his left leg.  (Ex. C, ¶31).

106.    Dr. Tilden prescribed Motrin 600 mg twice a day for 6 months, prescribed icy hot twice a day for 6 months and extended the order for the CAM boot. (Ex. C, ¶31).

107.    The referral for Plaintiff's follow-up with the orthopedic specialist was discussed in collegial review and approved.  (Ex. C, ¶32).

108.    Plaintiff saw another provider at Pontiac on May 18, 2019 who extended the prescription for Ultram for an additional two months. (Ex. C, ¶33).

109.    Dr. Tilden next saw Plaintiff on June 4, 2019, following his request for increased dose of Ultram.  (Ex. C, ¶34).

110.    On June 4, 2019, Plaintiff also complained of pain in his right knee.  (Ex. C, ¶34).

111.    Upon observation, Plaintiff had good range of motion, and no tenderness.  (Ex. C, ¶34).

112.    At that time, Plaintiff was wearing the CAM boot and had no neurovascular deficits.  (Ex. C, ¶34).

113.    As of June 4, 2019, Plaintiff had a follow-up appointment at UIC ortho clinic pending.  (Ex. C, ¶34).

114.    Dr. Tilden ordered an X-ray of Plaintiff's right knee and Ultram for two months.  (Ex. C, ¶34).

115.    The X-ray of his right knee was completed on June 4, 2019. (Ex. C, ¶35).

116.    According to the radiologist report, Plaintiff had mild osteoarthritis in the right knee.  (Ex. C, ¶35).

117.    Dr. Tilden next saw Plaintiff on July 1, 2019, in relation to complaints of a rash on his chest and legs.  (Ex. C, ¶36).

118.    Dr. Tilden observed multiple small abscesses of the hair follicles on Plaintiff's chest, arms and legs, similar to a heat rash.    (Ex. C, ¶36).

119.    Dr. Tilden prescribed Bactin antiseptic and the antibiotic Keflex.  (Ex. C, ¶36).

120.    On July 22, 2019, Plaintiff saw Dr. Sood, another practitioner at Pontiac, who reviewed the results of the knee X-ray and discussed the mild osteoarthritis. (Ex. C, ¶37).

121.    Plaintiff saw another practitioner, Dr. Shah, on August 7, 2019 regarding complaints of right knee pain and was given a prescription for naproxen.  (Ex. C, ¶38).

122.    Plaintiff was seen for a follow-up appointment at the UIC orthopedic clinic on August 14, 2019.  (Ex. C, ¶39).

123.    The specialist recommended Plaintiff see a different ortho specialist at UIC.  (Ex. C, ¶39).

124.    The orthopedic specialist did not recommend any immediate diagnostic testing on August 14, 2019.  (Ex. C, ¶39).

125.    The referral to the alternative specialist was discussed in collegial review and approved.  (Ex. C, ¶40).

126.    Dr. Tilden saw Plaintiff on August 15, 2019, following his writ to UIC, for complaints of pain in both knees.  (Ex. C, ¶41).

127.    Upon observation, Dr. Tilden noted good range of motion in both knees and the left calf had mild tenderness on deep palpation.  (Ex. C, ¶41).

128.    Dr. Tilden referred him to be seen by the orthopedic specialist at UIC for both knees, ordered X-rays on both knees and prescribed Ultram 50 mg. at bedtime for three months. (Ex. C, ¶41).

129.    Plaintiff was issued a knee brace for his right knee on August 20, 2019, with a permit for a year.  (Ex. C, ¶42).

130.    Plaintiff had the follow-up appointment with the orthopedic specialist on October 8, 2019.   This time, he was seen for the first time by Dr. Gonzalez.  (Ex. C, ¶43).

131.    Dr. Gonzalez noted the prior specialist found nothing wrong with Plaintiff.  (Ex. C, ¶43).

132.    Upon examination, Dr. Gonzalez found "a little bit" of swelling, "but it is soft". (Ex. C, ¶43).

133.    Dr. Gonzalez noted no bruising. (Ex. C, ¶43).

134.    Dr. Gonzalez found the left calf was functioning, but slightly weaker than the right side.   (Ex. C, ¶43).

135.    Dr. Gonzalez specifically noted: "[Plaintiff] is neurovascularly intact distally, and his gait is stable.  His exam is fairly benign except for the slight discomfort over the medial aspect of the calf, as well as decreased strength when compared to the right side."  (Ex. C, ¶43).

136.    Dr. Gonzalez recommended six to eight weeks of physical therapy for strengthening of the left lower extremity. (Ex. C, ¶43).

137.    Dr. Gonzalez also recommended considering an MRI if there was no improvement in several months.   (Ex. C, ¶43).

138.    Dr. Gonzalez did not recommend any immediate diagnostic testing.  (Ex. C, ¶43).

139.    Dr. Tilden next saw Plaintiff on October 8, 2019, upon his return from the follow-up visit with the orthopedic specialist at UIC.   (Ex. C, ¶44).

140.    On October 8, 2019, Plaintiff reported he was on day three of a hunger strike.  (Ex. C, ¶44).

141.    Plaintiff continued to complain about pain in his left leg.  (Ex. C, ¶44).

142.    Upon observation, Plaintiff's left calf was slightly larger than the right and Plaintiff complained of increased pain with dorsiflexion, which is movement of the foot such that the toes in an upward direction.    (Ex. C, ¶44).

143.    Dr. Tilden noted the left calf was functioning but weaker than the right.   (Ex. C, ¶44).

144.    Dr. Tilden ordered a urinalysis and complete blood workup per hunger strike protocols, and physical therapy for lower extremity strengthening.  (Ex. C, ¶44).

145.     Dr. Tilden noted an MRI would be considered if there was no improvement.  (Ex. C, ¶44).

146.     The referral for physical therapy was submitted for collegial review and approved. (Ex. C, ¶44).

147.     A referral was made for therapy at St. James Hospital on October 8, 2019.  (Ex. C, ¶44).

148.     On October 9, 2019, Dr. Tilden admitted Plaintiff to the infirmary for monitoring when he reported he was on a hunger strike.   (Ex. C, ¶46).

149.     Plaintiff was monitored by health care unit staff while in the infirmary and was stable. (Ex. C, ¶46).

150.     Dr. Tilden discharged him on October 10, 2019.  (Ex. C, ¶46).

151.     Dr. Tilden saw Plaintiff again on November 1, 2019, for continued complaints related to left calf pain. (Ex. C, ¶47).

152.     Upon observation, Dr. Tilden noted minimal edema, with no tenderness and no mass.  (Ex. C, ¶47).

153.     At that time, Plaintiff was scheduled for physical therapy at St. James Hospital.  (Ex. C, ¶47).

154.     On November 1, 2019, Dr. Tilden prescribed Ultram 100 mg. at bedtime for 3 months.  (Ex. C, ¶47).

155.     On November 6, 2019, a nurse made a referral for Plaintiff to see me following Plaintiff's request to have the Ultram increased to 150 mg.   (Ex. C, ¶48).

156.     Dr. Tilden saw Plaintiff on November 8, 2019, for his complaints of nocturnal pain and increased his Ultram dose to 150 mg. each night for 3 months. (Ex. C, ¶49).

157.    Plaintiff went to physical therapy at St. James Hospital on November 12, 2019. (Ex. C, ¶50).

158.    The physical therapist gave him a home exercise program for strengthening.  (Ex. C, ¶50).

159.    Dr. Tilden saw Plaintiff upon his return from physical therapy, gave Plaintiff the instructions for the home exercises and reviewed them with him. (Ex. C, ¶50).

160.    Dr. Tilden next saw Plaintiff at urgent care on November 26, 2019, for complaints of ear pain and continued pain in his left calf.  (Ex. C, ¶51).

161.    Dr. Tilden noted mild edema in Plaintiff's calf, prescribed Motrin for pain and Tums, and ordered follow-up with Dr. Tilden in two weeks.  (Ex. C, ¶51).

162.    Plaintiff was referred to an audiologist, which was approved in collegial review on December 4, 2019. (Ex. C, ¶52).

163.    Dr. Tilden saw Plaintiff on December 12, 2019, for follow-up regarding his left calf.   (Ex. C, ¶53).

164.    On December 12, 2019, Plaintiff complained of edema in the left calf and dry skin.  (Ex. C, ¶53).

165.    On December 12, 2019, Dr. Tilden noted minor edema in Plaintiff's left calf but no tenderness.  (Ex. C, ¶53).

166.    On December 12, 2019, Plaintiff was already on pain medication and had been previously provided physical therapy exercises.  (Ex. C, ¶53).

167.    On December 12, 2019, Dr. Tilden prescribed Icy Hot rub for the calf and moisturizer for the dry skin.  (Ex. C, ¶53).

168.    On December 21, 2019 Plaintiff requested a low bunk permit.  (Ex. C, ¶54).

169.    Plaintiff saw another provider on December 24, 2019, and reported he had been moved to an upper gallery necessitating a low gallery permit due to his calf injury.  (Ex. C, ¶54).

170.    The other provider issued Plaintiff a low gallery permit for 6 months.  (Ex. C, ¶54).

171.    An X-ray of Plaintiff's knees was taken on January 9, 2020.  (Ex. C, ¶55).

172.    According to the radiology report, the X-ray showed the left knee was unremarkable and the right knee had mild osteoarthritis. (Ex. C, ¶55).

173.    Dr. Tilden next saw Plaintiff on January 29, 2020, for continued complaints of left calf pain.  (Ex. C, ¶56).

174.    Dr. Tilden again referred Plaintiff to the UIC orthopedic clinic. (Ex. C, ¶56).

175.    Dr. Tilden's referral to the UIC orthopedic clinic was discussed in collegial review and approved on February 5, 2020. (Ex. C, ¶57).

176.    Plaintiff requested Ultram renewal on February 14, 2020 and was referred to Dr. Shah, another provider at Pontiac.  (Ex. C, ¶58).

177.    Plaintiff saw a nurse practitioner on February 25, 2020, when he requested a medication change, reporting a partial meniscus tear.  (Ex. C, ¶59).

178.    The nurse practitioner discussed Plaintiff's care with Dr. Tilden. (Ex. C, ¶59).

179.    At the February 25, 2020 visit, Plaintiff had a pending appointment at UIC orthopedic clinic.  (Ex. C, ¶59).

180.    Based on the discussion with Dr. Tilden, the nurse practitioner prescribed Plaintiff Ultram 100 mg twice a day for 3 months.  (Ex. C, ¶59).

181.    On February 26, 2020, Plaintiff was approved in collegial review for a hearing aid. (Ex. C, ¶60).

182.    In March 2020 non-emergency outside referrals were postponed due to COVID-19 related restrictions both at Pontiac and at the outside facilities. (Ex. C, ¶61).

183.    Plaintiff was referred for follow-up at UIC, including an MRI, but the appointment was repeatedly delayed due to COVID-19 restrictions.  (Ex. C, ¶62).

184.    On March 31, 2020, Plaintiff saw the nurse practitioner with complaints of nerve pain.  (Ex. C, ¶63).

185.    Upon observation, the nurse practitioner noted Plaintiff had a normal gait, with no visible deformity of the left calf.  (Ex. C, ¶63).

186.    The nurse practitioner prescribed Baclofen 10 mg. twice a day for a month and Robaxin 750 mg. once a day for 3 months.  (Ex. C, ¶63).

187.    On May 4, 2020, the nurse practitioner renewed Plaintiff's prescription for Ultram 100 mg. twice a day for 3 months. (Ex. C, ¶64).

188.    Each request for referral to an outside specialist was approved in collegial review and the recommendations of those specialists were followed.   (Ex. C, ¶65).

## ARGUMENT

**A.    Summary Judgment Standard**

"Federal Rule of Civil Procedure 56 imposes an initial burden of production on the party moving for summary judgment to inform the Court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  A defendant's burden is satisfied by pointing out to the court the absence of evidence to support the nonmoving party's claim. *Id.*  If a defendant points out an absence of evidence to support the plaintiff's claim, the plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which it will bear the burden of proof at trial. *Diperna v. Chicago School of Professional Psychology*, 893 F.3d 1001, 1006 (7th Cir. 2018). "As the put up or shut up moment in a lawsuit," summary judgment requires a nonmoving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). "Such a dispute exists when there is sufficient evidence favoring the non-moving party to permit a trier of fact to make a finding in the non-moving party's favor as to any issue for which [he] bears the burden of proof." *Id.* The Court may not consider inadmissible hearsay in ruling on a motion for summary judgment. *Cairel v. Alderden*, 821 F.3d 830 (7th Cir. 2016). A mere scintilla of evidence supporting plaintiff's position cannot create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## B.    Deliberate Indifference Standard

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 835, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious[1], and (2) the state officials acted with

---

[1] For the purposes of summary judgment, Defendants do not dispute Plaintiff had a serious medical need; however, reserve the right to contest the serious medical need if the case proceeds to trial.

deliberate indifference to his medical needs, which is a subjective standard.  *Sherrod v. Lingle*, 223 F.3d 605, 619 (7th Cir. 2000).   The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks."  *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992).

A prison official may be found in violation of an inmate's Eighth Amendment right to be free from cruel and unusual punishment if she acts (or fails to act) with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  The Supreme Court has interpreted the "deliberate indifference" standard to require a "reckless[] disregard[]" of a substantial risk to inmate health. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "Deliberate indifference" demands more than showing mere negligence: "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment." *Id.* at 838. *Conley v. Birch*, 796 F.3d 742, 746-747 (7th Cir. 2015).

The state of mind for deliberate indifference is something approaching criminal recklessness by failing to act despite knowledge of a substantial risk of serious harm.  *Arnett v. Webster,* 658 F.3d 742, 759 (7th Cir. 2011).   Even gross negligence cannot establish a constitutional violation if the defendants are not subjectively aware of a risk of harm from their inadequate treatment.  *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010).  Instead, the Plaintiff must provide evidence at summary judgment sufficient to support a finding the defendant actually knew of and disregarded a substantial risk of serious harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016); *Farmer,* 511 U.S. at 842.

When assessing claims of deliberate indifference against a medical professional, the "professional judgment standard" applies. *Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Under this standard, a medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under the circumstances. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011); *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008). A medical professional may only be held to have displayed deliberate indifference if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not base the decision on such a judgment." *Sain*, 512 F.3d at 895. The decision must be such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

## C.  There is no basis for a jury to find Nurse Practitioner Mara was deliberately indifferent.

A claim of deliberate indifference requires Plaintiff to show Defendants acted with a "sufficiently culpable state of mind," by intentionally or recklessly disregarding a risk of harm to Plaintiff. *Estelle*, 429 U.S. at 105-106; *Farmer*, 511 U.S. at 837. Here, according to Plaintiff's testimony, his claim against Mara rests on one visit on November 27, 2018[2]. (Ex. A, 26:5-31:11). Plaintiff alleges his calf was injured while playing football on the yard on November 25, 2018. (Ex. A, 24:7-21). Specifically, Plaintiff testified: "I went to go run and it felt like somebody kicked me in the leg. I fell to the floor. . . I hopped to the sideline, sat down . . . I thought maybe it was a cramp or something, and I rubbed it." (Ex. A, 24:15-20).

_____

[2] Mara saw Plaintiff on subsequent occasions, during which time Plaintiff was under the care of Dr. Tilden. Plaintiff does not allege any claim against Mara as to those visits.

At the time of the alleged calf injury, Plaintiff was already receiving Ultram for pain related to arthritis in his hip.  (Undisputed Material Facts ("UMF"), ¶7-9).  Ultram (also referred to as Tramadol) is an opioid which has the potential of addiction and side effects from long term use. (UMF, ¶11-12).  While X-rays of Plaintiff's hip showed only mild osteoarthritis, in mid-2018 Plaintiff requested higher doses of Ultram in relation to the hip pain.  (UMF, ¶15-17).  Mara saw Plaintiff on November 20, 2018, five days prior to the alleged calf injury, when Plaintiff continued to complain of pain in his left hip and lower extremity. (UMF, ¶25-28).  At that visit Mara continued the Ultram prescription at 50 mg. per day, twice a day, but discussed alternative pain treatments and the possibility of tapering of the Ultram at the next visit. (UMF, ¶31).  She also ordered a topical anti-inflammatory used to treat arthritis pain.  (UMF, ¶32-33).

Five days later, on November 25, 2018, Plaintiff sustained the alleged calf injury. (UMF, ¶34).  Plaintiff was first seen by a nurse in the healthcare unit on the day of the injury. (UMF, ¶34).  The nurse called Dr. Tilden, who ordered a lay-in, meaning Plaintiff was basically on bed rest, with meals brought to him, for five days.  (UMF, ¶35).  A prescription for pain medication was not necessary as Plaintiff was already receiving Ultram twice a day.  (UMF, ¶31).  The nurse also referred Plaintiff to see Mara two days later.  (UMF, ¶36).

Mara examined Plaintiff for the calf injury on November 27, 2018.  (UMF, ¶37).  Mara conducted the Homans sign test to check for signs of deep vein thrombosis ("DVT"), a blood clot in the leg vein.  (UMF, ¶39).  She found no redness, warmth or swelling of Plaintiff's calf. (UMF, ¶40).  Mara continued the previously ordered lay-in and pain medication and added a prescription for a muscle relaxer, Flexeril, at night for three nights along with a muscle rub twice a day.  (UMF, ¶41-42).  In addition, she ordered a follow-up visit in two weeks.  (UMF, ¶43).

Plaintiff complains that the Flexeril was out of stock at the facility and that he only received one dose. (Ex. A, 28:14-17). Without someone bringing it to her attention, Mara would have no way to know that the Flexeril was out of stock. (UMF, ¶44). She did not know it was out of stock when she wrote the prescription. (UMF, ¶45). That she did not check the supply in the pharmacy before making a prescription is far from intentionally or recklessly disregarding a risk of harm to Plaintiff. In fact, nothing in Plaintiff's description of the incident or Mara's objective exam of Plaintiff would have indicated Plaintiff was in any risk of harm – as he complained of pain but showed no swelling, fever, or discoloration. Plaintiff also argues Mara should have referred him to see a specialist. Again, nothing in his presentation would have indicated any referral was necessary. The decision to refer an inmate to a specialist is a matter of medical judgment beyond the Eighth Amendment unless the need was blatantly obvious and the failure to do so blatantly inappropriate. *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). No reasonable jury could find Mara acted with any culpable state of mind and Plaintiff's claim for deliberate indifference fails.

**D.    Dr. Tilden exercised his professional judgment in treating Plaintiff and ignored no risk of harm.**

A treatment decision based on professional judgment cannot evince deliberate indifference because professional judgment "implies a choice of what the defendant believed to be the best course of treatment." *Zaya v. Sood,* 836 F.3d 800, 805 (7th Cir. 2016). Here, Dr. Tilden first saw Plaintiff in relation to his alleged calf injury on December 5, 2018, after Plaintiff reported to nurse sick call on December 4, 2018 complaining that his calf pain had worsened since the November 25, 2018 injury. (UMF, ¶46-47). At that time, Dr. Tilden observed tenderness, swelling and bruising of Plaintiff's calf. (UMF, ¶48). He assessed that Plaintiff had a possible contusion or partial rupture of his calf muscle. (UMF, ¶49). Dr. Tilden ordered an X-

ray, ordered additional pain medication including Robaxin and Motrin, ordered hot packs twice a day for ten days and a follow-up exam in ten days.   (UMF, ¶50).

Dr. Tilden saw Plaintiff for the follow-up visit on December 14, 2018 and observed fluid build-up in Plaintiff's calf but no discoloration. (UMF, ¶53).    Dr. Tilden increased Plaintiff's Ultram prescription to 100 mg. twice day. (UMF, ¶54).    He also ordered blood tests, gave Plaintiff crutches with instruction to avoid weight bearing and admitted Plaintiff to the infirmary for observation.   (UMF, ¶58).    In addition, due to the fluid build-up, Dr. Tilden referred Plaintiff for an ultrasound to rule out DVT, which is potentially dangerous and would have required significantly different treatment from a muscle injury. (UMF, ¶54-57).

The ultrasound was taken the same day at a local hospital and revealed no DVT. (UMF, ¶59).    The radiology report noted "intramuscular fluid collection that may be secondary to hemorrhage associated with partial plantaris tendon rupture." (UMF, ¶60).  The plantaris tendon is the tendon that extends from the back of the knee down through the calf muscle and attaches to the achilles tendon near the ankle.  (UMF, ¶61).  The typical treatment for a partial plantaris tendon rupture is to rest it, avoiding weight bearing, and allow it to heal naturally. (UMF, ¶62). Most plantaris ruptures heal within two to eight weeks if allowed to properly rest.  (UMF, ¶63). Use of pain medication for the plantaris rupture is typically limited to non-steroid anti-inflammatories.  (UMF, ¶64).

Following return from the outside hospital, Plaintiff was monitored overnight in the infirmary and reported he was feeling better and the pain mediation was effective. (UMF, ¶65-66).   Dr. Tilden released Plaintiff the following day with instructions to avoid weight bearing on the left leg, and scheduled a follow-up visit five days later.   (UMF, ¶67).   At the follow-up visit on December 20, 2018, Dr. Tilden ordered prednisone to decrease the inflammation in

Plaintiff's calf and reduced the Ultram back to the 50 mg. twice per day dose.  (UMF, ¶69-73).

Dr. Tilden also ordered continued use of the crutches to avoid weight bearing on the affected leg.

(UMF, ¶73).    A nurse reported seeing Plaintiff on December 25, 2018, at which time his gait

was steady with no limp, and he was not using his crutches.  (UMF, ¶78-80).

Dr. Tilden saw Plaintiff for follow-up on January 2, 2019, at which time Plaintiff

continued to complain of pian in the left calf. (UMF, ¶81).   Dr. Tilden noted tenderness on the

inner portion of the calf, near the left ankle and ordered an X-ray of the ankle.  (UMF, ¶82-83).

By this time, Plaintiff's Ultram prescription had expired. (UMF, ¶84).   Dr. Tilden also ordered

Motrin for pain, ordered continued use of the crutches and hot packs. (UMF, ¶85).     Further,

given the continued complaints of pain more than a month after the alleged injury, Dr. Tilden

submitted a referral for Plaintiff to see an orthopedic specialist at University of Illinois –

Chicago. (UMF, ¶86-87).   Appointments to see a specialist are based on availability of the

specialists and an appointment was made for Plaintiff on March 22, 2019.   (UMF, ¶88, 98).   In

the time prior to the appointment with the orthopedic specialist, Plaintiff was prescribed Motrin

then Tylenol for pain and complained that neither was strong enough.  (UMF, ¶89-96).     In

response to his requests for stronger pain medication, he was again given Ultram.  (UMF, ¶97).

On March 22, 2019, Plaintiff saw the orthopedist who assessed Plaintiff with partial to

complete rupture of the plantaris tendon in his left leg and ordered a CAM boot immobilizer for

Plaintiff's left foot and leg.  (UMF, ¶98-100).     The orthopedist did not request any further

diagnostic testing.  (UMF, ¶101).    Dr. Tilden saw Plaintiff upon return from that visit and

ordered the recommended CAM boot and increased the Ultram prescription for two months.

(UMF, ¶102-104).   Dr. Tilden saw Plaintiff again in April, when Plaintiff continued to complain

of pain in the left leg.  Dr. Tilden prescribed Motrin, extended the order for the CAM boot, and referred Plaintiff for follow-up with the orthopedist.  (UMF, ¶105-107).

Plaintiff's prescription for Ultram expired in May and was extended by another provider at Pontiac.  (UMF, ¶108).   In June 2019, Plaintiff saw Dr. Tilden for Plaintiff's request for an increase in the dose of Ultram and complaints of pain in his right knee. (UMF, ¶109-110).   Dr. Tilden examined Plaintiff, found good range of motion and no tenderness of the right knee. (UMF, ¶111).   He ordered an X-ray of the right knee and continued the Ultram prescription at the same dose.  (UMF, ¶114).   The X-ray revealed mild osteoarthritis in the right knee.   (UMF, ¶115-116).

On August 14, 2019 Plaintiff again saw the orthopedist, who recommended no further testing or treatment and instead suggested only that Plaintiff see a different orthopedist.  (UMF, ¶122-125).   Dr. Tilden saw Plaintiff on August 15, 2019, following Plaintiff's visit with the orthopedic clinic, at which time Plaintiff complained of pain in both knees.  (UMF, ¶126).   Dr. Tilden examined Plaintiff, found good range of motion in both knees and mild calf tenderness with deep palpation.   (UMF, ¶127).      Dr. Tilden made the referral for the alternative orthopedist, ordered additional knee X-rays and prescribed a lesser dose of Ultram.   (UMF, ¶128).  Plaintiff was also issued a knee brace for his right knee.  (UMF, ¶129).

Plaintiff saw a new orthopedist at UIC, Dr. Gonzalez, on October 8, 2019.  (UMF, ¶130, 132-134).   Dr. Gonzalez noted the prior specialist found nothing wrong with Plaintiff.  (UMF, ¶131).   Dr. Gonzalez's assessment stated "[Plaintiff] is neurovascularly intact distally, and his gait is stable.  His exam is fairly benign except for the slight discomfort over the medial aspect of the calf, as well as decreased strength when compared to the right side."  (UMF, ¶135).   Dr. Gonzalez ordered physical therapy for strengthening and noted an MRI may be considered if

there was no improvement in several months.  (UMF, ¶136-137).  He did not suggest the need for any immediate testing or treatment aside from the physical therapy for strength.   (UMF, ¶138).

Dr. Tilden again saw Plaintiff upon his return from UIC.  At that time, Plaintiff indicated he was on a hunger strike.  (UMF, ¶139-140).  Dr. Tilden admitted Plaintiff to the infirmary and ordered monitoring in relation to the hunger strike. (UMF, ¶144, 148).    He also made the referral to St. James Hospital for the recommended physical therapy.  (UMF, ¶147).  Dr. Tilden saw Plaintiff again in November 2019, for Plaintiff's continued complaints of pain and requests for Ultram. (UMF, ¶151-156).   On November 1, 2019, Dr. Tilden ordered 100 mg. of Ultram at bedtime and, at Plaintiff's request seven days later, increased the dose to 150 mg.   (UMF, ¶154-156).

Plaintiff went to physical therapy at St. James Hospital on November 12, 2019 and was given a home exercise program for strengthening of his left calf. (UMF, ¶157).   In December 2019 and January 2020, Plaintiff continued to complain of pain in his calf and in both knees, requesting pain medication. (UMF, ¶163).    X-rays of the right knee during that time showed only mild osteoarthritis and the left knee was unremarkable. (UMF, ¶171-172).    Upon Plaintiff's request after being assigned to an upper gallery cell, Plaintiff was given a low gallery permit so that he would not have to climb stairs.  (UMF, ¶169-170).    By the end of January 2020, in response to Plaintiff's continued complaints, Dr. Tilden referred Plaintiff for a fourth visit with an orthopedic specialist.  (UMF, ¶173-174).    That appointment was made but was postponed due to restrictions related to COVID-19.  (UMF, ¶175, 182-83).

Plaintiff testified Dr. Tilden should not have taken X-rays when he saw him on December 5, 2018, but should have given him a more urgent referral to an outside specialist.  (Ex. A, 35:8-

36:23; 44:10-17).  This amounts to a disagreement with his physician's medical judgment, which is not an Eighth Amendment claim.  *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. Ill. 2007). Inmates are not entitled, as a matter of Constitutional law, to demand specific care or the best care possible.  *See Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *Hudson v. McMillan*, 503 U.S. 1, 9 (1992). The Eighth Amendment only entitles inmates to adequate medical care to meet a substantial risk of serious harm.  *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 1996).

At each encounter, Dr. Tilden exercised his professional judgment in providing treatment for Plaintiff's calf and responded reasonably based on Plaintiff's presentation, including prescription pain and anti-inflammatory medications, diagnostic testing and referrals to specialists.  Dr. Tilden initially assessed a muscle injury that is typically treated conservatively with rest of the effected muscle.    When Plaintiff presented with signs of fluid buildup in the calf, Dr. Tilden ordered an ultrasound at a local hospital – that was conducted on the same day – to rule out a DVT.    Throughout the course of treatment, Plaintiff has never been without a prescription for pain medication, as Dr. Tilden and the other practitioners attempted to balance Plaintiff's requests for increased doses of Ultram with its potential long-term effects.   When Plaintiff continued to complain, Dr. Tilden referred Plaintiff to see an orthopedic specialist – not once but four separate times, with the fourth visit having been scheduled but delayed due to COVID-19 restrictions.

Dr. Tilden followed all the recommendations from the orthopedic specialists, none of which were significantly different from the course of treatment initiated by Dr. Tilden.   None of the specialists provided a different diagnosis or requested any immediate further testing.  The

Seventh Circuit has declined to find a colorable Eighth Amendment claim when a specialist's recommendations are consistent with the treating physician's. In *Plummer v. Wexford Health Sources,* 609 Fed. Appx. 861 (7th Cir. 2015) (unpublished), an inmate claimed an unconstitutional delay in sending him to a pulmonologist for his asthma. However, when he was eventually sent, the specialist recommended the same treatment his doctors at the prison had been giving him. *Plummer,* 609 Fed. Appx. at 863. The Seventh Circuit observed that the fact the specialist recommended the same course of treatment as the prison doctors showed that the treatment was within the bounds of professional judgment. *Plummer,* 609 Fed. Appx. at 863, citing *Pyles*, 771 F.3d 403; *see also Davis v. Wahl,* 596 Fed. Appx. 488, 490 (7th Cir. Ill. 2015) (prison doctor not liable for delay in sending inmate to specialist where specialist recommended treatment similar to what had already been prescribed). Further, Dr. Tilden's reliance on the recommendations of specialists precludes a claim of deliberate indifference unless the advice of the specialists was blatantly inappropriate. *Donald v. Wexford,* 982 F.3d 451, 462-63 (7th Cir. 2020). Dr. Tilden's treatment of Plaintiff was reasonable and far from "complete abandonment of professional judgment" required for Eighth Amendment liability.

**E.    Plaintiff has no evidence to support *Monell* liability against Wexford.**

A private corporation, such as Wexford Health Sources, Inc., "cannot be held liable under §1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Illinois Department of Corrections*, 746 F.3d 782, 790 (7th Cir. 2014). The standards for corporate liability are derived from the decision of the United States Supreme Court *in Monell v. Department of Social Services*, 436 U.S. 658 (1978), which delineated the scope of §1983 liability for municipal corporations. *Hahn v. Walsh*, 762 F.3d 617, 638-40 (7th Cir 2014); *Iskander v. Forest Park*, 690 F.2d 126, 128-29 (7th Cir. 1982). Private

corporations are treated the same as public corporations for purposes of liability under §1983. *Montague v. Wexford Health Sources, Inc.*, 615 Fed. Appx. 378, 378-79 (7th Cir. 2015). Plaintiff must show deliberate action attributable to the corporation directly caused a deprivation of federal rights. *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000). The unconstitutional custom or policy must have been the "moving force" behind the plaintiff's constitutional injury. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016).

First, Plaintiff fails to show any violation of his Eighth Amendment rights in relation to the treatment of the alleged calf injury, which defeats his *Monell* claim *ab initio*. *See Ray v. Wexford Health Sources, Inc*., 706 F.3d 864, 866 (7th Cir. 2013) (unnecessary to determine what Wexford's policy was where the plaintiff failed to establish a constitutional problem with his treatment and did not suffer actionable injury from the policy he attributed to Wexford); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

In support of his claim against Wexford, Plaintiff testified he sued Wexford because the "doctors and nurses work for Wexford." (Ex. A, 71:12-16). However, "*[r]espondeat superior* liability does not apply to private corporations under §1983." *Shields,* 746 F.3d at 790. As such, Wexford cannot be held liable simply because of alleged unconstitutional conduct or any alleged improper care by its employees. Rather, Plaintiff must show that the tort was committed or authorized by someone at the policymaking level of the corporation. *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017). Plaintiff "must show that the [corporate] action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the [corporate] action and the deprivation of federal rights." *Board of County Commissioners v. Brown*, 520 U.S. 397, 404 (1997). Thus, plaintiff must establish the state of mind necessary to prove the underlying violation. *Id.* at 405. *Monell* liability requires

proof policy making officials acted with deliberate indifference to known or obvious consequences. *Wragg v. Village of Thorton*, 604 F.3d 464, 469 (7th Cir. 2010).

Plaintiff has no evidence of any official policy or widespread custom or practice of Wexford that caused him harm. To establish liability, Plaintiff must introduce evidence of either an official policy or a widespread custom or practice that resulted in him being denied necessary care. Plaintiff testified he believes Wexford has a "cost-cutting" policy where they refuse to send inmates to outside referrals. (Ex. A, 67:4-12; 72: 20-24). Clearly no such official policy exists as demonstrated by the extensive care provided to Plaintiff. Plaintiff, was sent to outside referrals in relation to his calf injury – not once but six times, including the ultrasound and physical therapy at a local hospital and three trips to see two different orthopedic specialists at UIC, with a fourth visit to UIC approved and scheduled but delayed due to COVID-19. (UMF, ¶59, 86, 122, 125, 130, 147, 175, 183). Every single request submitted for outside care for Plaintiff was approved by Wexford. (UMF, ¶87, 107, 125, 146, 175, 188). As such, Plaintiff has no evidence he was harmed by any policy of Wexford. Due to the absence of any unconstitutional custom, policy or practice, Defendant Wexford is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 324-25 (allowing defendant to obtain summary judgment by pointing to the absence of evince in support of Plaintiff's claim).

## CONCLUSION

Dr. Tilden and Nurse Practitioner Mara provided Plaintiff extensive care and treatment with respect to his calf injury. Both exercised their professional judgment in treating the injury and there is no evidence either treater ignored any risk of harm to Plaintiff. Plaintiff was seen by multiple outside providers, none of whom offered a diagnosis different from that made by Dr. Tilden or recommended significantly different treatment. Further, Plaintiff fails to produce any

evidence to support his claim against Wexford.   Defendants are entitled to judgment as a matter of law.

WHEREFORE, for the above reasons, WEXFORD HEALTH SOURCES, INC, ANDREW TILDEN, MD and SHEILA MARA, NP respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Joy C. Syrcle
One of the Attorneys for Defendant,
WEXFORD HEALTH SOURCES, INC,
ANDREW TILDEN, MD and SHEILA MARA,
NP

Joy C. Syrcle
ARDC No. 6302066
CASSIDAY SCHADE LLP
3100 Montvale Drive
Springfield, IL 62704
(217) 572-1714
(217) 572-1613 (Fax)
jsyrcle@cassiday.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 25, 2021, I electronically filed the foregoing Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Azariah Jelks
Assistant Attorney General
500 South Second Street
Springfield IL 62701

and I hereby certify that a true and correct copy of the foregoing Motion for Summary Judgment was served via regular mail to the following non-CM-ECF participant at the following address by depositing the same in the U.S. mail located in Springfield, Illinois, with proper postage prepaid, on June 25, 2021. Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct:

PRO SE:
Richard Kupferschmidt, M25549
Pontiac Correctional Center
Inmate Mail/Parcels
PO Box 99
Pontiac IL 61764
(815) 842-2816

/s/ Joy C. Syrcle

9872182 JSYRCLE;JSYRCLE